1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE SOUTHERN DISTRICT OF TEXAS

3    HOUSTON DIVISION

4  FEDERAL OF STATE MASSAGE         §     CASE NO. 4:17-CV-02936
   THERAPY BOARDS                   §
5                                   §     HOUSTON, TEXAS
   VERSUS                           §     TUESDAY,
6                                   §     NOVEMBER 6, 2018
   MENDEZ MASTER TRAINING           §
7  CENTER, INC.                     §     1:07 P.M. TO 2:35 P.M.

8
                      DISCOVERY HEARING
9
           BEFORE THE HONORABLE NANCY F. ATLAS
10              UNITED STATES DISTRICT JUDGE

11

12     APPEARANCES:                  SEE NEXT PAGE

13     ELECTRONIC RECORDING OFFICER: DESIREE SILLAS

14

15

16

17

18

19

20              TRANSCRIPTION SERVICE BY:

21       JUDICIAL TRANSCRIBERS OF TEXAS, LLC
              935 ELDRIDGE ROAD, #144
22             SUGAR LAND, TEXAS 77478
          Tel: 281-277-5325 / Fax: 281-277-0946
23            www.judicialtranscribers.com

24
      Proceedings recorded by electronic sound recording;
25       transcript produced by transcription service.

1                          <u>APPEARANCES</u>:

2

3    FOR THE PLAINTIFF:            BAKER & MCKENZIE LLP
                                  Lisa Meyerhoff, Esq.
4                                 700 Louisiana, Ste. 3000
                                  Houston, TX 77002
5                                 713-427-5005

6                                 BAKER & MCKENZIE LLP
                                  Adam Gentle, Esq.
7                                 815 Connecticut Ave. NW
                                  Washington, DC  20006-4078

8

9

10   FOR THE DEFENDANT:           FRANCK & ASSOCIATES
                                  Herman Franck, Esq.
11                                910 Florin Rd., #212
                                  Sacramento, CA  95831
12                                916-447-8400

13

14

15

16

17

18

19

20

21

22

23

24

25

1      HOUSTON, TEXAS; TUESDAY, NOVEMBER 6, 2018; 1:07 P.M.

2              THE CLERK:  All rise.

3          (Call to Order of the Court.)

4              THE COURT:  Please be seated.

5              Good afternoon.  This is the case of Federation of

6      State Massage Therapy Boards versus Mendez Master Training

7      Center, and others.

8              Would Counsel state their appearances, please?

9              MS. MEYERHOFF:  Good afternoon, Your Honor.  Lisa

10     Meyerhoff and Adam Gentle of Baker McKenzie for the

11     Plaintiff.

12             MR. FRANCK:  Good afternoon, Your Honor.  Herman

13     Franck on behalf of all the Defendants.

14             THE COURT:  Okay.  This is a -- sent a discovery

15     and request for extension of time informal conference

16     brought on by the letter of October 22, signed by Mr. Franck

17     in regard to requesting essentially to open discovery up

18     completely.  The letter is dated October 22 and the

19     discovery period ended October 5th of this year.

20             Discovery that is sought is wide-ranging, covering

21     defensive theories in response to the Plaintiff's claims, as

22     well as affirmative theories asserted by a late-filed

23     counterclaim, as well as Requests for Interrogatories and

24     Production of Documents that are unspecified as to the

25     topic.

1          The Plaintiff opposes this broad-ranging series of

2     requests and extension of time in a letter I received

3     yesterday, November 5th.  It's dated November 5th.  And

4     these are Documents 80 and 87 for the Record.

5          I also have the Defendant's Motion to Modify

6     Counterclaim Filing Deadline and Motion for Leave to file a

7     Counterclaim with supporting memorandum, and other exhibits.

8          I've looked at this case and the prior rulings

9     that were issued, and I'm in a bit of a quandary about how

10    to handle these requests.

11         I'm going to let you, Mr. Franck, go first.  I

12    would like to understand how you justify the request to

13    essentially start this case over now?

14         MR. FRANCK:  Would you like me to address the

15    Court from here, or should I stand at the podium?

16         THE COURT:  You can stand right there.  It's fine.

17         MR. FRANCK:  Okay.  Very well, thank you.

18         THE COURT:  No problem.

19         MR. FRANCK:  Your Honor, first of all, one thing

20    I've done since I wrote the letter since, and I gave this to

21    Counsel, was to actually give them the proposed discovery,

22    if you will.

23         THE COURT:  Okay, good.

24         MR. FRANCK:  What I've done is I've kind of

25    narrowed it down, just so you know.  I don't think it really

1  changes your overall concept that you want everything.

2         THE COURT:  Well, I just sort of summarized your

3  letter.

4         MR. FRANCK:  It's correct.  I'm not disputing it.

5  We want -- I mean, we haven't done any discovery, zero.

6         And I can tell you about one thing is that, you

7  know, they're still doing discovery.  Their discovery was

8  very last minute, but it had a due date of October 5, so

9  there wasn't a time period.

10        THE COURT:  Yeah.

11        MR. FRANCK:  So that's -- I know that.

12        I can also tell you that we were quite busy

13 responding to their stuff.  We did a big job to get all the

14 facts, documents, we gave them a lot of stuff and --

15        THE COURT:  You gave them "stuff."  What does that

16 mean?

17        MR. FRANCK:  What I mean is, they did a request

18 for these documents.  They did, you know, basic discovery

19 and --

20        THE COURT:  Are you from California?

21        MR. FRANCK:  Yes.

22        THE COURT:  Your letterhead says you are.

23        MR. FRANCK:  Yes.

24        THE COURT:  Do you have something called "Initial

25 Disclosures" --

1          MR. FRANCK:  Yes.

2          THE COURT:  -- enforced by the Court there?

3          MR. FRANCK:  Yes.

4          THE COURT:  It's a federal rule.

5          MR. FRANCK:  Rule 26.

6          THE COURT:  Exactly, federal rule.

7          I'm wondering why your clients haven't complied

8  with Rule 26 with the initial disclosure requirements in

9  that rule, as well as other rules?

10          MR. FRANCK:  We did.

11          THE COURT:  Well, why would there be so much in

12  the way of discovery?  What -- in my world initial

13  disclosures means you produce documents in support of all of

14  your legal theories and defenses.

15          MR. FRANCK:  I can tell you this, Your Honor, the

16  way both sides handled this is, is both sides have done a

17  Rule 26 disclosure.  Both sides have listed witnesses and

18  listed documents, but they weren't produced.  They were

19  listed.

20          THE COURT:  I see.

21          MR. FRANCK:  And you'll recall when you gave us an

22  Order to further meet and confer, and I can tell you that

23  Friday Counsel and I did that.  And one of the things

24  they've done, which helps for sure is they would read to

25  provide us with the documents that they've listed, but we

1 haven't received those yet, but I'm not complaining, but

2 they said they would do it.

3          THE COURT:  Okay.

4          MR. FRANCK:  So we listed them.  Just to answer

5 your question, we listed them, yes.  But that's not the same

6 as answering interrogatories.  We had to, you know, answer

7 questions.  I'm not complaining about it.  We did it.

8          And they were cooperative.  I think we need an

9 extension, they gave us one in, you know, in the ordinary

10 course, but I'm just trying to point out, we did a good job.

11 I think did we did a good job because I haven't received a

12 letter back yet saying, "You didn't answer the question.

13 This objection doesn't work."  In fact, we didn't object.

14 We just answered the questions.

15          THE COURT:  Okay.

16          MR. FRANCK:  The questions were good and proper

17 questions.  They know how to write a question.  We wrote the

18 answers.

19          I will also tell the Court that we are this month

20 doing depositions of my clients.  They're going to be taken

21 November 27th, 28th, 29th, and 30th.  So discovery is open.

22 I mean --

23          THE COURT:  Underway.

24          MR. FRANCK:  And it's either way.

25          THE COURT:  Yeah, but underway by both sides is

1  what you're saying?

2          MR. FRANCK:  Well, right.  We're asking for our

3  side, but they're doing their side still.  So they've done a

4  -- I would describe it this way, the status:  They've had a

5  full barrage -- actually, they had two barrages of

6  discovery.  They did one early on and then on the -- they

7  had a -- there was a Motion to Dismiss based on personal

8  jurisdiction.

9          THE COURT:  Right.

10          MR. FRANCK:  So they did discovery on that and

11  that's okay.  We -- you know, I was responsive.

12          THE COURT:  I ordered it.

13          MR. FRANCK:  Well, it was responded.

14          THE COURT:  This was before your time.

15          MR. FRANCK:   Fair enough.  And --

16          THE COURT:  I ordered it and for what it's worth,

17  it was not an easy go.

18          MR. FRANCK:  Okay.

19          THE COURT:  That's not your personal fault or

20  anything.  I'm just --

21          MR. FRANCK:  No.  I understand.

22          And I call Your Honor as I've come to this case, I

23  like to answer questions.  I don't want to not have it.

24  They've got a question, I want to have an answer.  I just

25  gave Counsel another document.

1          THE COURT:  Okay.

2          MR. FRANCK:  I'm that kind of guy.

3          THE COURT:  All right.

4          MR. FRANCK:  So we're not being that way.  I know

5     what you're talking about, though, and I have more of a you

6     gotta question?  I gotta answer.

7          And they've asked proper questions.  They asked

8     proper requests to produce.  We've responded.  We gave them

9     everything.  After October 5, they're discovery was also

10    done in just kind of a relaxed way, and I'm not complaining

11    about that.

12         The pleadings, you know, they're not exactly

13    settled.  They're in the art in my Motion for Leave to

14    Amend, then they will be settled.  But you know, we're still

15    in a mode where (indiscernible) the pleadings because

16    obviously some of my requests for discovery will become moot

17    if you don't allow my cross-complaint.

18         But one part that would still be very much alive

19    is my first item I listed, which is a personal list

20    knowledgeable about their case-in-chief.  I'd like to hear

21    to whomever they're going to bring over to state the basic

22    elements of each of their claims.  I can't.

23         THE COURT:  Facts that support the basic elements.

24         MR. FRANCK:  Yes, and everyone we'll request,

25    obviously.  Obviously if I had done that timely, we wouldn't

1  have an issue with it.

2          THE COURT:  Right.

3          MR. FRANCK:  The only real issue is whether in the

4  Court's discretion you can excuse our being late on the

5  following grounds.  I hate to state that we were busy, but

6  we were busy.  We were busy with the following items:  There

7  was an amended pleading that they filed and we did a Motion

8  to Dismiss.  They had a bunch of discovery, we were busy

9  responding to that.

10          And it's kind of like we got -- our Motion to

11  Dismiss got ruled on, as you know.  We had to do an Answer,

12  and we did a Cross-Complaint.

13          There was a bit of a foul up actually in getting

14  the Court's Order because we weren't on the ECF -- our

15  account on ECF wasn't opened yet with the Court.  It takes a

16  while, so we learned.  There's a process to get your ECF

17  account.  And because of that, we are -- and you have --

18          THE COURT:  But are you not in -- on ECF in

19  Sacramento?

20          MR. FRANCK:  We are.  And you have to actually

21  apply here.  I didn't realize that.  I thought once you were

22  in, you were in.  I didn't realize you're not.  You can -- I

23  mean, we found out about your Order because we just went to

24  PACER.  We can still go to PACER.  And we looked it up and

25  we thought, uh-oh.  And I can tell you by the time we

1  figured that out, there was like one day left.  I think we

2  found out like the day before the 15-day -- or 14-day period

3  runs.

4            And that's one of the reasons I'm asking you to

5  please excuse that.  It's sort of a -- I mean, we will take

6  responsibility for it.  We should have been looking at your

7  -- first of all, I was just surprised.  I didn't think it

8  would take that long.

9            I can tell the Court I phoned your Admin Group

10  that does that.

11            THE COURT:  In the Clerk's Office.

12            MR. FRANCK:  Yeah.  There's some people that do

13  that, and they just informed me, hey, it takes a while.

14  That's all.

15            THE COURT:  Oh.

16            MR. FRANCK:  They weren't picking on us.  It just

17  takes a while to do it.

18            So because of that, I request that our -- these

19  issues be excused, in effect, by the Court.

20            With regard to our discovery, I appreciate

21  Counsel's offer on Friday.  They'll at least give us their

22  initial disclosures.

23            It is my understanding, even in California, we do

24  this.  We do initial disclosures.  We don't actually produce

25  the stuff, we just list it and then you give it to the other

1   side and they got a list.  And every normal request to

2   produce is:  "All items in your initial disclosures."

3           THE COURT:  Oh, around here the rule says you may

4   list, unless the Court --

5           MR. FRANCK:  Okay.

6           THE COURT:  -- says otherwise, and I order

7   otherwise routinely.  But you came in in the middle of the

8   movie, so.

9           MR. FRANCK:  So both sides listed, okay?  And now

10   they're agreeing -- we've certainly given them our stuff,

11   you know?  They're agreeing to give at least the stuff

12   they've listed, which is progress.  I just got that

13   agreement on Friday, so that's --

14           THE COURT:  Yes.

15           MR. FRANCK:  -- you said meet and confer, you'll

16   be happy to know every now and then meet and confer works.

17           THE COURT:  Yes.

18           MR. FRANCK:  At least it did a little.

19           The other thing that we worked out on Friday,

20   which I appreciate, was Counsel agreed that as long as we're

21   here, we could at least talk about the Motion for Leave to

22   Amend.

23           THE COURT:  Sure.

24           MR. FRANCK:  You got us all here, you know, and I

25   can tell you what I want to say about it is basically what

1  I've already told you.  I would like to add that when I'm

2  looking at my Cross-Complaint and I'm looking at the

3  compulsory cross-complaint rule, it looks like my

4  Cross-Complaint is in the category of a compulsory

5  cross-complaint.  That's my view.

6           And with that in mind -- that's a circumstance I

7  request the Court take a look at from the standpoint of,

8  okay, if I don't -- it's not like I can just go on and file

9  a new case.

10          THE COURT:  Well, one of the -- you hit on one of

11  the issues that, frankly, I questioned, which was why these

12  wide-ranging counterclaims -- you keep calling them

13  "Cross-Complaints."  I'm not clear why.  I think it's a

14  "Counterclaim" to tell you the truth.

15          MR. FRANCK:  I think you're right.  That's right.

16          THE COURT:  Okay.  But anyway, why your people

17  didn't haul off and sue in another court.  Frankly, your

18  clients have been evasive in the course of this litigation.

19  They've fought tooth and nail.  They've resisted discovery.

20  They've been difficult on a lot of the mechanics and they're

21  asserting rights they may have.  I'm not criticizing them on

22  the merits, but what I am saying is:  If they thought that

23  there was some antitrust or civil rights claim or something,

24  they could have sued the Federation anytime they wanted.

25  They didn't have to do it in a counterclaim in this case.

1        And so they could have fought tooth and nail over

2   here -- their perfect right.  And filed a separate claim or

3   case with these affirmative claims that -- maybe not be

4   counterclaims, compulsory.  I'm just asking you.  And let's

5   face it.  They had a lawyer at the beginning who wasn't --

6   who had been sanctioned and not told me about it, and then

7   they got another lawyer, and they filed Motion to Dismiss

8   and all that.  And then you come in -- I rule and then you

9   come in, or I ruled, actually.  I'm not sure when you came

10  in.  You came in in June and I don't think I ruled 'till

11  August.

12       But I don't know that you filed the responsive

13  papers.

14       Did you file them?

15       MR. FRANCK:  Yes.

16       THE COURT:  Okay.

17       MR. FRANCK:  Yes.

18       THE COURT:  So anyway, my point was this case has

19  been pending for 14 months, and it's late to bring in what I

20  consider to be pretty wide-ranging and unusual, but it may

21  be valid; it may be not.  I haven't looked at them yet.

22  Claims against this Federation and I'm just sort of mulling

23  over your point about it being compulsory counterclaims.

24       I don't know that they are, but I would need to

25  think about that.

1     MR. FRANCK:  Your Honor, I appreciate --

2     THE COURT:  The facts are somewhat different, but

3 again, I'm not sure what facts you're alleging because your

4 complaint -- your proposed counterclaims are not that

5 detailed, so it's a little hard for me to know.

6     MR. FRANCK:  Let me answer the Court's question,

7 first of all.

8     I'm not positive it's compulsory from --

9     THE COURT:  And it may or may not be.  I'm not

10 ruling.

11     MR. FRANCK:  Okay.  Fair enough.

12     I'm in a category where I'm looking at it, and I'm

13 trying to think it is and I'll tell you why.  The triggering

14 event here where my client had the first adverse conduct by

15 the Plaintiff was when they sued.  What they did was they

16 kind of shot me down, okay?  They said, you cannot do this

17 anymore.  You're using our test questions.  You're not

18 allowed to do that.

19     THE COURT:  When you were obtaining -- and they

20 were complaining that your people are obtaining the test

21 questions surreptiously and --

22     MR. FRANCK:  Yes.

23     THE COURT:  -- deceitfully.

24     MR. FRANCK:  Yes.  And so, they basically put my

25 client out of business.  So that actually is the first

1    adverse conduct between the parties.

2            THE COURT:  All right.

3            MR. FRANCK:  Prior to that, I don't know that

4    there was an -- I mean, they didn't know that that would

5    happen, first of all.  I'm not so sure they could have said,

6    You don't allow us to exist, because up until that date, as

7    far as my client knew, they were allowed.

8            This kind of service my client provides is openly

9    advertised.  Nobody does it in secret and there's an

10   industry out there that is a test preparation service, kind

11   of like Stanley Capital and the SAT.

12           THE COURT:  Sure, sure.  I believe I've had other

13   cases involving test masters and some others, and

14   engineering settings lawsuit.

15           But here's the point, I think that what they're

16   worked up about is not your test prep.  It's that you're

17   taking copies of questions surreptiously and then using

18   them, teaching the answers so that people are not learning

19   substance.  They're learning how to answer the questions

20   that your people have reason to believe will be on the exam.

21   And so there's an element of what is alleged to be cheating.

22           MR. FRANCK:  You know, and I know --

23           THE COURT:  That's not test prep.  That's a

24   different category, according to the allegations.

25           MR. FRANCK:  Your Honor, I can assure you your

1 understanding is totally correct.  And I know that for a

2 fact because during our meet and confer discussion with

3 Counsel, --

4          THE COURT:  Okay.

5          MR. FRANCK:  -- that's exactly what she told me.

6 The issue is --

7          THE COURT:  Okay.  I've read --

8          MR. FRANCK:  It's a cheating issue, okay?

9          You know, one of the points I made to counter that

10 is I remember all too well studying for the multi-state bar

11 exam.

12          THE COURT:  Uh-huh.

13          MR. FRANCK:  And do you know what they use on

14 those exams on our group?  Prior questions.  They do.  And

15 it's --

16          THE COURT:  Yes, given how do you think they've

17 acquired those?

18          MR. FRANCK:  Somehow BARBRI (phonetic) got them

19 all.  That's where I did it.  And they had them all.

20          THE COURT:  I took the same course.

21          MR. FRANCK:  Okay.  Wonderful class, and they give

22 you the actual question and if you think about --

23          THE COURT:  It's questions from years earlier,

24 right?

25          MR. FRANCK:  They call them "past exam questions."

1       THE COURT:  Yes.

2       MR. FRANCK:  I don't know about years ago, but --

3       THE COURT:  Okay.

4       MR. FRANCK:  -- past.

5       THE COURT:  I take your point.

6       MR. FRANCK:  And whatever.  And I know this is the

7  debate I had with Counsel.  Her comment was she uses the

8  word "retired" questions.

9       THE COURT:  Uh-huh.

10      MR. FRANCK:  The questions are retired.  I don't

11 know that that's -- I mean, I was just told they were past

12 questions.  Whether they're never going to be used again, I

13 don't know.

14      THE COURT:  I guess that's what discovery will

15 tell us.

16      MR. FRANCK:  Well, if you allow it.

17    (Laughter)

18      MR. FRANCK:  But let me suggest this, though.

19 What we have is -- just so you, the Court, is aware on our

20 end -- is we've got people that actually don't really speak

21 English.  They do some, but not much.  They're basically

22 Chinese.

23      And my client has a Mexican surname.  Her husband

24 is Mexican, but she's Chinese.

25      THE COURT:  Okay.

1         MR. FRANCK: Okay. So her client base is Chinese.

2 That's what they are. And they are -- I was trying to

3 explain this to Counsel. I don't think she believed me, but

4 they are extremely knowledgeable and skilled about massage

5 therapy. They totally know their stuff. Their issue isn't,

6 "You've got to give me the answers because I don't know the

7 answer." Their issue is: "You need to explain these

8 questions in Chinese because right now they're in English

9 and I don't speak enough English to figure it out."

10         I believe the Plaintiff is of a view that if you

11 don't speak English sufficient enough to get by without my

12 client or someone else out there with a translation service,

13 then you don't qualify. You can't be a massage therapy

14 person.

15         THE COURT: Oh.

16         MR. FRANCK: Something I can guarantee you my

17 clients and the many students that have gone there would

18 just say they're totally wrong. They totally know their

19 business. They know how to do it. They're very good at

20 what they do.

21         THE COURT: Let me ask you something. Do you know

22 whether the -- and I should ask this of Plaintiff's Counsel,

23 but do you know whether there is -- the test is given in

24 Spanish or in some other language besides Chinese? And

25 besides English?

1          MR. FRANCK:  Spanish, yeah.  It is also given in

2     Spanish.  And that's nice.  One language down.

3          I can tell the Court I just voted in California on

4     Saturday and it's done in seven languages.

5          THE COURT:  Oh, wow.

6          MR. FRANCK:  And my son had to do the DMV test.

7     They have that in 13 languages.

8          THE COURT:  Right.

9          MR. FRANCK:  It's amazing, and I don't know how

10    all that came to be, but worse thing here -- and we're not

11    actually telling them they should give the exam in Chinese.

12    We're not going to find anyone saying that.  What we're

13    saying is:  We can teach it in Chinese.

14         And they claim these questions -- by the way to

15    use your word -- are surreptiously obtained, but I just gave

16    Counsel a photograph that's on Chinese and LA.com called

17    another service like ours, using the exact same question.

18    You can see because it's a photo of it.

19         THE COURT:  Uh-huh.

20         MR. FRANCK:  And so any concept that these are

21    highly secret or kept under cover is I don't think true at

22    all.  I think these questions have been out there since --

23    I've got data showing they've been here from like 2014 and

24    very commonly used, very openly used.

25         I can also tell the Court that this Plaintiff did

1  not do a "Cease and Desist" request prior to the lawsuit.

2  They just sued, all right?

3           THE COURT:  Yeah, but they didn't get an

4  injunction either.

5           MR. FRANCK:  Well, I'll tell you what.  They

6  wouldn't need one because the minute my client got sued --

7  as difficult as my client may be to the Court, I appreciate

8  that --

9           THE COURT:  I'm not sure it was the client or it

10  was the lawyers, I'm really not.

11          MR. FRANCK:  Your Honor --

12          THE COURT:  I'm not trying to throw stones at your

13  client on the merits.

14          MR. FRANCK:  -- Your Honor, one thing I can tell

15  you, in my life I've represented many, many Chinese people

16  and I can tell you coming from Communist China, they are

17  deathly afraid of court.

18          THE COURT:  Yeah.

19          MR. FRANCK:  And most of the people go to court to

20  get executed, you know, and they don't want to -- you know,

21  even if you ask a simple question:  What is your name?  You

22  know, they'll be like, "Objection; relevance."  You know,

23  they'll fight you, you know, until the end of time.

24          And it's kind of -- I can just tell you.  I have

25  this problem, too.  I have problems getting clients to just

1  even come to court, you know?  Even when they've got all the

2  evidence and they're the Plaintiff, you know, no one is

3  going to get executed.  You're going to win money, and they

4  still don't want to go.

5         So I wanted you to know there's definitely that

6  kind of problem here.

7         THE COURT:  Culture.

8         MR. FRANCK:  And I'm a guy -- I'm kind of a

9  cross-over guy.  I was married to a Chinese woman for a long

10 time.  So I kind of know this personality-type. And I'm the

11 one that kind of says, "Look, the Court can be your friend.

12 You know, if you go there properly and do what you're

13 supposed to do, follow all the rules, you know, when they

14 ask a question, answer the question.  You would be surprised

15 how much work that takes to do sometimes.

16        I want to assure the Court that I have gotten my

17 client here to that point.

18        Now my client also -- I represented him in

19 California.  So that's how we met.  We were over there, as

20 the Court knows, and sued -- a lot of the stuff they've been

21 sued for are events that occurred in California.

22        THE COURT:  Right.

23        MR. FRANCK:  And they brought me into a matter

24 they had there.  It's really not connected to this, but it

25 was another entity.  My client own another company that for

1  the massage therapy exam, you need to have done 500 hours of

2  work to quality to take the exam.  It's a little bit like

3  you can't just sit for the bar exam.  You've got to three

4  years of law school.

5        And my client's surplus isn't that 500 hours.  You

6  have to have done that and then you come to them with proof

7  of that and they do a pure test prep service.  It's kind of

8  like BARBRI doesn't send you to law school.

9        THE COURT:  Right.

10        MR. FRANCK:  You know, BARBRI prepares you for the

11  bar.  It's a very similar analogy.

12        And I can tell you right ow, there are probably 10

13  or 20 service providers just like my client who are out

14  there.  They've got the same test questions.  They're

15  advertising it proudly that "We have a 98 percent pass

16  rate," you know, to which Counsel says, "Yeah, while you're

17  cheating."  And I don't really know that it is.  You've

18  still got to know all that info.

19        I'll give you an example.  We have --

20        THE COURT:  Could we get back to -- I appreciate

21  the background to tell you the truth.

22        MR. FRANCK:  Okay.  All right.

23        THE COURT:  It's very interesting.  But I think we

24  need to get back to the issues that we have today, which

25  are:  Scope of discovery, if it's not too late, and whether

1   or not the counterclaim can be filed because I extend the

2   counterclaim answer deadline.

3           MR. FRANCK:  My main answer to your question is

4   that they have not taken adverse action against my client

5   until they sued.

6           THE COURT:  Uh-huh.

7           MR. FRANCK:  There was no --

8           THE COURT:  Right.  I understand that.  You've now

9   clarified.

10          MR. FRANCK:  Okay.  Okay.  Your Honor, I guess

11  this is one of these discretionary issues for the Court,

12  whether you excuse someone's lateness.  I've kind of

13  explained why we were late.  I apologize to the Court for

14  that, and I'm also trying to show the Court that we are now

15  being diligent, at least with their stuff, --

16          THE COURT:  Can I ask you one question about the

17  lateness?  You said -- I think your appearance was in June,

18  and you're saying you made an appearance in June, but you

19  didn't get my August ruling until -- somehow you had seen

20  the July -- well, the Amended Complaint that was on file and

21  then the Corrected Amended Complaint, and you responded to

22  the motion -- I'm sorry.  That's Plaintiff responded to the

23  Motion to Dismiss.

24          They amended the Complaint in May.  It was on

25  file, and Motion to Appear *Pro Hac Vice*, you guys -- you

1   filed on June 21.  Granted the same day.

2           You guys filed the Motion to Dismiss the Amended

3   Complaint, Document 66, on July 3rd.  Your own declaration

4   on the 11th.

5           So -- and then on the 11th, it says, "Statement of

6   Counsel for Defendants, we need to manually file Motion to

7   Dismiss."

8           MR. FRANCK:  That's because we were not approved

9   for ECF.  That's why.  And Your Honor --

10          THE COURT:  Oh, you could see the documents on

11  PACER, but you couldn't file?

12          MR. FRANCK:  Right, yeah, and until you're

13  approved with an ECF account, you can't actually file, but

14  you can see them.  But you can see them, and that's how we

15  -- if you're wondering how were you able to look at them?

16  The answer is PACER.  That's still correct.

17          THE COURT:  Okay.  That was the question.

18          MR. FRANCK:  And just so you know, Your Honor,

19  that's the way we did find your Order and we went to PACER a

20  little bit too late.  My regret is that we weren't going

21  like earlier.

22          THE COURT:  Is there a reason that when you

23  realized that there had been an Order and it was 13 days or

24  whatever you said, that you didn't ask for an extension of

25  time?

1    MR. FRANCK:  I know.  There's no reason for that

2  and I regret that we did not.  We should have and --

3    THE COURT:  Because the standard, which I wrote in

4  my Order, the most recent memorandum, or Order really, was

5  -- and I laid out the rules and I need to fine excusable

6  neglect.  I do respect that I have some discretion, but the

7  standard is not nothing.  So I'm just wondering about that.

8    MR. FRANCK:  Your Honor, our -- this is what we

9  did is we just kind of randomly looked at PACER and we

10  looked too late is what it was.  And we're looking for the

11  decision -- Your Honor, there's no due date on your decision

12  as you know.  It comes out when it comes out.

13    THE COURT:  Sure.

14    MR. FRANCK:  And so we just kind of randomly

15  looked.  We looked on that date, and I do agree with the

16  Court's idea that what we should have done is on that day

17  said, "Oh, my goodness.  We just learned about this.  Let's

18  do a quick Motion for Extension," or something.  And we did

19  not do that.  Instead, we just got busy and did an Answer

20  and a Counterclaim, and I don't know.

21    THE COURT:  Okay.  I understand.

22    MR. FRANCK:  That's what it is, you know?

23    THE COURT:  Okay.  So what are you actually -- I

24  mean, assuming I know you want to file this counterclaim and

25  I know you want some discovery.  What exactly are you

1  proposing?  I saw that you had some ideas in your paperwork,

2  but frankly, I couldn't even follow those completely.

3          Tell me what you're thinking in terms of the

4  amount of time and what discovery you're really thinking you

5  need?

6          MR. FRANCK:  Your Honor, I can answer that

7  question much better now and I have a couple of suggestions

8  for the Court.

9          I did prepare what I would call the proposed

10  discovery and at the time I wrote that letter, I did not

11  have it prepared.

12          THE COURT:  Right.

13          MR. FRANCK:  And -- but I can tell you it kind of

14  tracks what I said in the letter.  PMK deposition on claims

15  of liability and damages to Plaintiff.

16          THE COURT:  Okay.

17          MR. FRANCK:  I got that.

18          THE COURT:  Got that.

19          MR. FRANCK:  I got that data.

20          And similarly, as to each of our counterclaims,

21  the basic requirements.

22          THE COURT:  What is it similar?  That's what I

23  don't understand.

24          MR. FRANCK:  In other words, asking them questions

25  about the specifics of our counterclaim.  So what I want is

1 -- if they're going to deny it, which I totally expect them

2 to do -- a person most knowledgeable who could deny the

3 facts we're alleging, and tell us what alternative facts

4 they have.  So that's the nature of the PMK.

5        THE COURT:  Okay.  I see those as different; that

6 is, the affirmative claims versus the --

7        MR. FRANCK:  I'm sorry, Your Honor.

8        THE COURT:  -- your affirmative claims and the

9 facts supporting your affirmative claims are different than

10 the people who might know something, or the scope of the

11 discovery is different through your affirmative claims

12 versus what Plaintiff has alleged.

13        MR. FRANCK:  Your Honor?

14        THE COURT:  But in any event, I get the point.

15        MR. FRANCK:  Yeah, I'm just saying it's similar in

16 the sense that they got so many causes of action.  We've got

17 three.  I want to know their denials -- you know, or to what

18 extent they actually might admit something.  You never know.

19 They might say yes to something.

20        THE COURT:  Yeah.

21        MR. FRANCK:  So it's basically their claims and

22 our claims.

23        THE COURT:  Okay.

24        MR. FRANCK:  I want to know if they deny them and

25 if so --

1      THE COURT:  Well they have to answer your

2   counterclaim if they let it be filed obviously.

3      MR. FRANCK:  Yes, yes.

4      THE COURT:  And then we'll see.

5      But anyway, deposition of FSMBT -- MTB, that's

6   deposition of their person on your federal civil rights

7   claim?

8      MR. FRANCK:  Yes.  And our negligence claim and

9   our antitrust claim.

10      THE COURT:  Okay.  Well I don't see anything about

11   the negligence claim, but I'll assume you meant it.

12      Okay.

13      MR. FRANCK:  I do see a stain on my letter.

14      THE COURT:  Right.

15      MR. FRANCK:  But I've done it should be.  That's

16   an omission on my part.

17      So what I've done is I've created --

18      THE COURT:  And then keep going.  What is the

19   series of interrogatories about?

20      MR. FRANCK:  I actually -- I could scratch that

21   from the list.  I'm not going to have any problems.

22      THE COURT:  You'll just do it through depositions?

23      MR. FRANCK:  Yeah, yes.  So we'll just do the

24   deposition and the request to produce documents is basically

25   the statement of request to produce that I've done in the

1  PMK deposition and are proposing.

2          And it's documents that support their case-in-

3  chief, which we may have kind of sort of worked it out.

4  They're willing to give me their initial disclosures.  That

5  might actually solve that.

6          And then documents supporting their denial of our

7  other claims, our counterclaims.

8          THE COURT:  Okay.  I got it.

9          MR. FRANCK:  Those are basically what I'm after

10 right now.

11         THE COURT:  All right.  Thank you very much.

12         MR. FRANCK:  If I may?  One other thing about the

13 counterclaim.  My request was that we could get into the

14 status of where it was before you struck it, which was

15 there's a Motion to Dismiss that they filed.  It's fully

16 briefed, waiting for a decision.

17         THE COURT:  Okay.

18         MR. FRANCK:  We'd like to put it back --

19         THE COURT:  Are you satisfied with your

20 counterclaims without leave to amend?  Because let's put it

21 this way, I want to get this case, if I allow the -- strike

22 that.

23         If I allow the filing of the three counterclaims

24 you've asserted, I'm asking you are you satisfied and you

25 are prepared to live with that counterclaim paper; that is,

1  the September 10th paper that was filed?  And that's it,

2  right or fall on that?

3          MR. FRANCK:  Yes.  I understand.  Yes.

4          THE COURT:  Because normally as you may know, if

5  you grant a Motion to Dismiss, then you've got to get leave

6  to amend, and this case is already old, and so I'm trying to

7  figure out:  Do you need leave to amend in light of what you

8  have already seen from the Plaintiff's Counter-Defendant's

9  Motion to Dismiss?

10         MR. FRANCK:  Your Honor, I'm just going to agree

11 that we'll sink or swim on the current version of the

12 pleadings.  And I appreciate what the Court is stating.  To

13 me, that's a fair compromise, if you will.  I hate to say,

14 gosh, I don't need leave to amend because for all I know

15 you'll -- if you were to --

16         THE COURT:  Well, you know that -- you know what

17 they think the problems are.

18         MR. FRANCK:  I do.

19         THE COURT:  And now I'm not bound to that and you

20 know, it's possible I could come up with something

21 different, I don't know.  I didn't deal with it.

22         MR. FRANCK:  But --

23         THE COURT:  But you know what I'm basically saying

24 to you is:  Do you propose that you rely solely on the

25 current -- I'll call it the "September 10th Counterclaim" --

1  and that's it, or are you suggesting you get to do a little

2  clean up in light of all the other stuff we talked about

3  with respect to documents that you haven't yet seen and the

4  like?

5        MR. FRANCK:  Your Honor, I will sink or swim on

6  the counterclaim as is.

7        THE COURT:  Okay.  So you want a person most

8  knowledgeable on the Plaintiff's claims against your

9  clients.  You want somebody -- according to what you've

10 written in the letter:  Documents listed in the Plaintiff's

11 initial disclosures and request to produce documents

12 regarding written policies and programs to turn away test

13 takers, which is an allegation they've made.

14       MR. FRANCK:  That's an allegation we made.

15       THE COURT:  I'm sorry, you've made.

16       MR. FRANCK:  Yes.

17       THE COURT:  And you want a deposition about their

18 positions on the three proposed counterclaims, which are

19 negligence, some sort of due process claim, and an antitrust

20 claim, Sherman?

21       MR. FRANCK:  Yes.

22       THE COURT:  Okay.  And the rest of this goes by

23 the wayside?

24       MR. FRANCK:  Yes.

25       THE COURT:  All right.  Have you produced

 1 everything that your clients have in their possession in

 2 support of their defenses and proposed counterclaims?  That

 3 is all documents both supporting or pertaining to your

 4 positions in this case?

 5         MR. FRANCK:  I want to say almost all.  Let me

 6 tell you the categories I haven't given anything.  I

 7 actually just collected some up.

 8         There's some advertising documents, some of which

 9 we've produced and some of which we have not.  And I'm

10 getting advertisements of other similar service providers.

11 So there's a little bit more in that category.

12         THE COURT:  You mean competitors of yours?

13         MR. FRANCK:  Yes.

14         THE COURT:  Okay.

15         MR. FRANCK:  I'm trying to show that this practice

16 is open -- openly done, not just by my client, but many

17 others, and as far as everybody knew, it was okay.  Nobody

18 knew they had a problem.  And --

19         THE COURT:  Are you suggesting -- I understand the

20 point.  Are you suggesting that if the tests were offered in

21 Chinese that your clients wouldn't need to copy the English

22 questions, or are you saying something different?  Because

23 you've had two lines of discussion here.

24         MR. FRANCK:  Well, let me answer it this way:  If

25 the test were given in Chinese --

1          THE COURT:  Uh-huh.

2          MR. FRANCK:  -- all right, my clients would

3    probably have to totally revise their test prep service.

4    Let me say it that way.  Because right now it's primary --

5    it's focused on kind of a translation process.

6          THE COURT:  But isn't it true that you're -- and

7    I'm only keying off of what you've told me.  It's been very

8    educational.  But isn't it true that your clients are

9    teaching the -- their customers, their test takers, to

10   memorize the questions and then the answers in English, as

11   opposed to your clients teaching the merits of what is

12   required to be certified?

13         It sounds like you're doing the former because

14   you're teaching them to answer in English regardless of

15   substance.

16         MR. FRANCK:  No.  Let me tell you the answer to

17   that.  The questions that my client bought from the file

18   were in the form of English question and a Chinese answer,

19   kind of like your suggestion.  My clients changed all that

20   and did a program that gave both the question and the

21   answer, all of it, in Chinese.

22         THE COURT:  Chinese or English?

23         MR. FRANCK:  Chinese.

24         THE COURT:  Okay.

25         MR. FRANCK:  Yeah.  In other words, they got the

1  whole thing in Chinese.  And not just --

2          THE COURT:  So how do the test takers who go to

3  your client's service learn how to communicate in English

4  the answers which is how the test is given?

5          MR. FRANCK:  The less -- the way they do it is

6  they call it the primary words -- I'm trying to remember the

7  exact quote they use, but the question tests certain words

8  you need to know.

9          THE COURT:  Oh.

10         MR. FRANCK:  And they focus on those words and try

11 to take those words.  So the test taker knows those -- it's

12 almost like they know those words.  And if I can, I'd --

13         THE COURT:  Are these essay questions or are they

14 short answers?

15         MR. FRANCK:  It's a, b, c, d.

16         THE COURT:  Short answers, multiple choice.

17         MR. FRANCK:  It's like the multi-state exam.

18         THE COURT:  But multiple choice?

19         MR. FRANCK:  Yes, multiple choice.  That's what it

20 is, so I don't think there's any essay on it.  I don't

21 believe so.

22         THE COURT:  Okay.  I'm just trying to get the lay

23 of the land.

24         MR. FRANCK:  Yeah, I think it's just a, b, c, d

25 and that's what it is.  And they kind of walked me through

it.  I saw how it works.  So they did this alteration to
what they bought.  They took an item that had 515 questions
and had the -- all of which was in English, and had the
answer only in Chinese.  And that smacks a little bit about
what you're saying.  It's like you're just memorizing.  And
I know that's Plaintiff's issue about that.

And we took that -- my client took it and actually
had the whole thing translated into Chinese.  So now they
get the whole question in Chinese and the right answer in
Chinese, and they know like the key words.  So then when
they walk into the test, they may not know that whole
question, but they know the key words.

THE COURT:  I see.

MR. FRANCK:  I want to make a short analogy for
you.  You know, in China they have McDonalds.  And a lot of
those people don't know English, but they know how to say
"French fry."  They know how to say "Big Mac," okay?  And
they couldn't tell you, like, you know, how do you get to
the library?  They could never tell you, but in other words,
you've learned the words you need for that job.

THE COURT:  Well, French fries and McDonalds have
become international words.

MR. FRANCK:  Yeah, I think you're right.

THE COURT:  That's really the point.

MR. FRANCK:  Everywhere.

1          THE COURT:  Okay.  Let's switch gears to

2     Ms. Meyerhoff and find out your views on the primary issues

3     -- or Mr. Gentle?

4          MR. GENTLE:  Gentle, yes.

5          THE COURT:  Why don't you go ahead?

6          MR. GENTLE:  Thank you, Judge.

7          I think you may have noted that I just submitted

8     my application *pro hac vice* yesterday.

9          THE COURT:  I think I signed it.

10         THE CLERK:  You did.

11         MR. GENTLE:  Okay, great.  So I'm hesitant to dive

12    right into the whole conversation on the merits that we just

13    heard.

14         THE COURT:  Well, it's interesting to me to hear

15    it from the Defense because I've heard a lot from you

16    guys --

17         MR. GENTLE:  Fair enough.

18         THE COURT:  -- and very little from the Defense in

19    the last 14 months --

20         MR. GENTLE:  Fair enough.

21         THE COURT:  -- in terms of, you know, their

22    positions.

23         MR. GENTLE:  So then just speaking to the issues

24    that I think are before the Court today, I think they

25    essentially fall into three buckets.  We have discovery on

1  our claims, discovery on Defendant's counterclaims, and then

2  the Defendant's Request for Leave to Refile their

3  Counterclaim that was struck, I believe on November 1st by

4  this Court.

5          So to me it makes sense to start with the first

6  bucket of discovery that the Defendants seek.

7          THE COURT:  Well don't you think we should turn

8  first to whether I allow the amendment -- or the filing of

9  the counterclaim?

10         MR. GENTLE:  I will handle it in whichever

11  order --

12         THE COURT:  Well because we wouldn't have to

13  discuss discovery.

14         MR. GENTLE:  Fair enough.

15         THE COURT:  Because I don't think that the

16  affirmative defenses that are alleged in the Answer are

17  truly affirmative defenses to the extent of an antitrust

18  claim or due process claim.  I'm not -- that's again, not an

19  official ruling, but it struck me that those are affirmative

20  claims, but not defenses.

21         So your first position I need to know and I grant

22  you that that was not on the Agenda until yesterday, and if

23  you feel strongly about it, I'll give you a chance to

24  respond in writing.  But I would like to at least know your

25  overall position on it because I certainly don't want to get

1 into a discovery battle on a claim that hasn't been filed.

2       MR. GENTLE: Absolutely. I'm happy to speak on

3 it, but I'd like to reserve our right to file a brief if we

4 feel that after this it is necessary.

5       THE COURT: Okay. Okay.

6       MR. GENTLE: So with respect to Defendant's leave

7 to refile his counterclaims, frankly, Your Honor, I think

8 that your decision on November 1st sums it rather well about

9 why that cannot be permitted. Your Order clearly states the

10 standard Rule 6, which addresses what we need for the Court

11 to issue a new deadline after that deadline has expired,

12 which is the case here.

13       And that's good cause and excusable neglect. Even

14 in those situations, as you're well aware, it's in your

15 discretion, so that's the standard we're operating under

16 here.

17       The Defendant or Defendant's Counsel here today

18 joined this case June 21st, that's at Docket No. 64. And it

19 seems to me that what we have here are three layers of

20 neglect that need to be excused. First of all, Defendant's

21 untimeliness in the answering and filing of the

22 Counterclaims. The ECF issue notwithstanding, as you

23 pointed out, Your Honor, there was a lapse of two weeks

24 between when Counsel says that he learned of your Order and

25 the actual filing of the Counterclaims and the Answer.

1       It seems that the responsible thing to do as an

2  Officer of the Court and in efficiency for your clients is

3  to immediately file a motion with the Court to ask for leave

4  for additional time because you know you need it.

5       Just like you're not operating in the land of

6  ignorance anymore.  You see it on the ECF.  You know you're

7  behind.  It needs to be addressed with the Court and Counsel

8  failed to reach out the Court, Counsel failed to reach out

9  to Plaintiffs, just ignored it.  Then two weeks later drops

10  the bomb.  It's not just an Answer, it's an Answer and three

11  frankly frivolous counterclaims, totally outside the scope

12  of this litigation.

13       When we filed our Motion to Dismiss those

14  counterclaims, first argument in our motion was a Motion to

15  Strike based on their untimeliness.  And at that juncture

16  procedurally, as you cite in your Order, if there isn't good

17  cause and neglect shown at that moment, the Court doesn't

18  even have discretion to accept a late filing.

19       So on that basis alone, because Defendants in

20  their Counterclaim didn't even ask for it, you have grounds

21  to strike it.

22       Nevertheless we argued the point that they were

23  untimely.  You granted -- oh, well then, Counsel responds,

24  right?  This is our second place of negligent.

25       In the response they don't even mention the

argument.  They offer no excusable neglect, no good cause,
no reason why the Federation (indiscernible) in use could
incur outrageous legal expenses defending frivolous
counterclaims and protracted litigation because of Counsel's
inability to operate on ECF or whatever possible excusable
neglect there could be.

Then we arrived to the third place, Your Honor,
which is the current filing before us, which is finally an
effort to show good cause and excusable neglect and I'm
sorry to say that Counsel's explanation of "got busy," too
busy filing of frivolous counterclaims, was the reason
everything got backed up in this litigation.

Inexcusable neglect, I don't understand how it's
anything other than malpractice, Your Honor.

THE COURT:  Okay.  The -- okay, do you acknowledge
that there is discretion -- I have discretion under the
rules for good cause or neglect or whatever?

MR. GENTLE:  Absolutely, Your Honor.

THE COURT:  All right.  When can you get your
response in to the Motion to Extend the Deadline?

I mean, the motion was only filed yesterday so I
don't feel it would be fair to rule without a response in
writing.

MR. GENTLE:  I think it's maybe important to point
out that the motion is fundamentally flawed in that Rule 15

1  which governs amending a counterclaim.

2       THE COURT:  I understand.

3       MR. GENTLE:  It's the amendment of a counterclaim

4  that's not at issue here, Your Honor, it's a timing issue.

5  So I think if we are forced to brief that, respond to it, we

6  should also be entitled to fees at some point for responding

7  to frivolous baseless claims and misapplication of the law.

8       THE COURT:  Okay.  You can ask for whatever you

9  want.

10      MR. GENTLE:  Then with respect, we'd ask for fees

11 if we file -- if we're forced to file a response to this

12 motion.

13      THE COURT:  Okay.  Well let me see if I understand

14 correctly.  I'm offering you time to respond in writing

15 instead of giving you exactly four days' notice on the

16 motion.  And you're telling me you don't want four -- you

17 don't want to put in something in writing, you want to just

18 rise or fall on argument here today?

19      MR. GENTLE:  No, Your Honor.  We would graciously

20 take the time to respond in writing.

21      THE COURT:  Okay.  So after that if you want to

22 ask for fees, you can ask for fees.  That's your business,

23 not mine.

24      MR. GENTLE:  Understood.

25      THE COURT:  It would seem to me that having some

written response would be appropriate and so let's do it
this way:  You can file something by Monday the 12th --
well, that's a holiday.  Can you get it in by the 9th?  Less
time I give you the faster it will be, the shorter it will
be, and --

          MR. GENTLE:  More succinct.

          THE COURT:  And yes, the cheaper it will be.

          MR. GENTLE:  I mean, your rule specifically
requests "succinct" pleadings.

          THE COURT:  I ask for that.

          MR. GENTLE:  Yes, we'd like to reply by the 9th,
Your Honor.

          THE COURT:  Okay.  Let's do that.  That will be
great.

          I wouldn't over think this.  I think you just get
it out.  It's like the equivalent of a letter and
double-spaced.

          MR. GENTLE:  Okay.  Fair enough.

          THE COURT:  The -- so you oppose this on the
grounds you've indicated.

          Now let's talk about the discovery.  I'm
particularly focused on the issue that the -- nobody has
done any discovery in this case.  I'm a little frustrated
that you guys didn't turn over your documents, but I can't
criticize you because the rules do require it.  I always

1 require -- the rules allow a listing, as opposed to turning

2 the documents over and as I have told Mr. Franck, a listing

3 is worthless.

4 　　　　So you will have to turn your documents over and I

5 gather you're prepared to do that momentarily.

6 　　　　MR. GENTLE:  We are, Your Honor, with certain

7 restrictions on the -- and less questions, which Defendants

8 seem to believe they have a constitutional right to steal,

9 to produce and sell,

10 　　　　THE COURT:  Uh-huh.

11 　　　　MR. GENTLE:  And so those materials are highly

12 sensitive and we need to figure out a way to have them

13 reviewed without further jeopardizing the safety and

14 security of that.

15 　　　　THE COURT:  Well, is there a protective order in

16 this case?

17 　　　　MR. GENTLE:  There is a protective order.

18 　　　　THE COURT:  Counsel's eyes only?  I mean, what are

19 you talking about?

20 　　　　MR. GENTLE:  There's only -- understood I think

21 there is concern at this point about Counsel's eyes, given

22 the theories advanced in defense and in the counterclaims

23 that he has a right and his clients have a right to take

24 these questions and do whatever they want with them.

25 　　　　THE COURT:  Right.  Well, that's what the whole

1  lawsuit is about.  So you can object where you see fit.

2          MR. GENTLE:  Okay.

3          THE COURT:  But I'm having trouble believing that

4  turning over at least some questions in order to prove your

5  case that they were stolen in your opinion -- not my

6  words -- are, I mean, you have to turn some of it over.

7          MR. GENTLE:  Fair enough.  And under --

8          THE COURT:  I'm just going to tell you to keep

9  your eye on the ball.

10         MR. GENTLE:  Yes.

11         THE COURT:  I'm looking at you, but telling your

12 clients.

13         MR. GENTLE:  Yes.

14         THE COURT:  Client, to look and keep the eye on

15 the ball because frankly stop complaining about the way

16 things are alleged and talk about the substance both in your

17 Motion to Dismiss and in fighting over discovery.  If you

18 intend to prove a case, you have to turn material over.  Now

19 whether it's in question and all, that's a separate answer,

20 separate discussion I'm happy to have.

21         But we have a protective order.  It's Document 44.

22         MR. FRANCK:  Yes.

23         THE COURT:  This lawyer has not been a problem.

24 There were prior one or more lawyers that were a problem,

25 but I think that we can -- you can work something out.

1          If you want to pay for some third party

2     intermediary to look at them, the questions and compare

3     them, that's an option.  We have this in here, this expert

4     consultant.  Attachment -- confidentiality agreement for

5     expert consultant or employee of any party.

6          MR. FRANCK:  Yes.

7          THE COURT:  It's Exhibit A, and itself.  I'll let

8     you work on that level of detail, but I want to be very

9     clear to the Federation that if they intend to prove their

10    claims, they will have to turn over documents to prove the

11    claims, and I don't know why you're talking about

12    counterclaims when they haven't been approved, but to the

13    extent that you're talking about affirmative defenses, which

14    are the same as counterclaims, maybe that's what you're

15    thinking.

16         I didn't hear that from the Plaintiff -- from the

17    defense, but I want to be very clear.  Nobody can use a

18    document in summary judgment, trial, or otherwise, which has

19    been objected to and not turned over in response to a valid

20    request.

21         MR. GENTLE:  Understood.

22         THE COURT:  No witness can start talking about

23    topics that were not disclosed in initial disclosures as

24    part of that witness's range of knowledge.  This is not

25    going to be a game of "gotcha."

1          Do both sides understand that?

2          MR. GENTLE:  Yes.

3          MR. FRANCK:  Yes.

4          THE COURT:  And I'm concerned about that, okay?

5          Mr. Franck may not have been on the ball to the

6 extent he now wishes he were or his people were and I'll

7 have to deal with that, but given the fact that the

8 Plaintiff hasn't even turned over documents and is trying to

9 take depositions, I'm hard pressed to say that the discovery

10 period ending on paper at October 5th is, in fact, over and

11 prohibiting discovery.  I can't do that.

12          So you guys understandably given the number of

13 motions to dismiss and other procedural things we've been

14 dealing with have, by default, if you will, extended the

15 discovery period.

16          And I think it's necessary to extend that period

17 to some degree, but I'm not inclined to extend it very long.

18          With respect to the claims that the Plaintiff has

19 asserted, the discovery needs to be done and I'm interested

20 in hearing how much time and what you want.  I never did get

21 Mr. Franck to comment on time, but I'd like to hear from you

22 on that proposal.

23          MR. GENTLE:  Thank you, Your Honor.  Just first as

24 a matter note, the only reason discovery is still happening

25 and depositions are happening is because Counsel requested a

1  two-week extension to provide their responses to our

2  discovery requests, --

3          THE COURT:  Uh-huh.

4          MR. GENTLE:  -- which were timely made way back in

5  August.  That pushed it out two weeks, and then Counsel

6  agreed to take depositions after close of discovery.  So

7  that was our good bid effort to --

8          THE COURT:  Fair enough.

9          MR. GENTLE:  Okay.

10          THE COURT:  But it's still going on.

11          MR. GENTLE:  Understood.  And at this time we

12  would need until the end of November when we're scheduled to

13  have our depositions and mediation.

14          THE COURT:  Okay.

15          MR. GENTLE:  Okay.  There is depositions now will

16  fall within this new discovery period.

17          THE COURT:  Yes.  So we're going to list what

18  depositions need to be taken, and we're going to limit them.

19          Well, who are you interested in taking?

20          MR. GENTLE:  Tesla Mendez, Jorge Mendez, and a

21  30(b)(6) deposition of both MMTC and MMTC Texas on -- these

22  depositions were noticed two months ago.

23          THE COURT:  And what date?

24          MR. GENTLE:  Oh, they will be -- we're working in

25  there right now.  We're currently looking at November 27,

1  28, 29, as a window and we're hoping to also facilitate

2  mediation within that same window in an effort to keep

3  things efficient here.

4          THE COURT:  Okay.  30(b)(6) of who?  Of what?

5          MR. GENTLE:  Of their corporate entity, so MMTC or

6  Mendez Master Training Centers, as you know it's a

7  California entity.  And then MMTC Texas, the Texas entity.

8  But we've noticed that as a single 30(b)(6).

9          MR. FRANCK:  Your Honor, if I could --

10         THE COURT:  Wait a minute.  How many depos are you

11 thinking about?  I'm just unclear.

12         MR. GENTLE:  Three.

13         THE COURT:  Total of three?

14         MR. GENTLE:  Yes.

15         THE COURT:  And do you believe -- do you know the

16 two corporate entities have the same rep, 30(b)(6) designee?

17 Do you already know that, or are you assuming it?

18         MR. GENTLE:  I believe Counsel confirmed that in

19 private on our call, but --

20         THE COURT:  Okay.

21         MR. GENTLE:  -- we'd have to toss that question

22 back to him.

23         THE COURT:  All right.  Fair enough.  Okay.

24         MR. FRANCK:  I was just going to say that very

25 question, Tesla Mendez on this will be the 30(b)(6) witness.

1        THE COURT:  So she'll testify both factually on

2   behalf of herself individually and then as the corporate

3   rep?

4        MR. FRANCK:  Yes.

5        THE COURT:  All right.  But that --

6        MR. FRANCK:  I have a suspicion -- I just did one

7   of these other day with PMK and the owner of the company and

8   it only took one day because it's just like the same thing.

9        THE COURT:  Right.

10       MR. FRANCK:  So we're good.  I think we've noticed

11  four days, so --

12       THE COURT:  So you have plenty of time?

13       MR. FRANCK:  -- we have plenty of time, yes.

14       THE COURT:  Yes, okay, good.  And so you're

15  planning it right after Thanksgiving is really the point?

16  Okay.

17       MR. GENTLE:  Yes.  That's the week after

18  Thanksgiving.  It wasn't that we noticed for four days, it's

19  that we created a four-day window to figure out

20  scheduling-wise what was going on.

21       THE COURT:  Okay.  Fair enough.

22       What is the --

23       MR. GENTLE:  Three days with mediation.

24       THE COURT:  I'm sorry?

25       MR. GENTLE:  We plan to have the depositions

1  completed in two days and then a third day for mediation.

2  THE COURT:  Oh, I see.  And who is going to be

3  your mediator?

4  MR. GENTLE:  We have a mediator proposed to

5  Counsel.  After today if he has moment to call.

6  THE COURT:  Are you planning on mediating in

7  Houston or in California?

8  MR. GENTLE:  We're planning to mediate here in

9  Houston.  That came up on our conference call on Friday, as

10  well, and Counsel seems amenable to that.

11  THE COURT:  Are your depositions going to take

12  place in Houston, too?

13  MR. FRANCK:  Your Honor, we asked them if they

14  would -- my clients will be in LA at that time, so I had

15  asked them, do you mind doing the depositions at one of your

16  offices in California?  And I kind of got a maybe yes on

17  that.  It looks like the depos will happen in San Francisco

18  at the Baker McKenzie office there.  My client will fly up

19  from LA there.

20  THE COURT:  Where are your corporate documents and

21  your files and records?

22  MR. FRANCK:  Here.  They've moved here, but

23  they've still got stuff going on there.  So to just give you

24  an idea, Mr. Mendez owns a totally separate kind of business

25  there.  It's an electrical distributor company.  And he's

1   got that going on.

2           THE COURT:  Right, okay.

3           MR. FRANCK:  So he's in LA right now and he'll be

4   there on the date of the depo, so we had said:  Can we do it

5   there?

6           THE COURT:  Here's my problem.  I want it where

7   the documents are so that if there's a -- it's a corporate

8   rep depo.  Mister may not be involved in the corporate rep

9   case, but Miss Tesla is, apparently, and my experience and I

10  grant you it's a while ago, but there are almost always

11  documents that come up during a deposition and if you're in

12  the location where the deposition -- I mean, sorry, if the

13  deposition is in the location where the documents are

14  located, it's easy to run and get documents, and finish this

15  all up on this tight schedule you're discussing.

16          MR. FRANCK:  I have a simple answer for that.  I

17  can tell you that my client has everything on her laptop.

18  And --

19          THE COURT:  So wherever it could be printed.

20          MR. FRANCK:  Yeah.  We'll bring the laptop.

21          THE COURT:  I would say so.

22          MR. FRANCK:  Yeah, so I think we'll have

23  everything.  I know what you're saying and I agree with you.

24  Stuff comes up.  And very commonly someone will ask a

25  question about a document and the witness says, "Oh, yeah, I

do have that."

THE COURT:  Exactly, exactly.  It's a good faith
response, but you want to see the document and I am trying
to avoid more delays, and frankly later, hassles because oh,
I didn't get around to it.  I didn't find the document,
whatever.  You know, I mean, I would like it to be pretty
much seamless with the depo.

MR. FRANCK:  Sure.

THE COURT:  That was the goal.

MR. FRANCK:  I think we can achieve that by having
an agreement, which I'll make right now, that my client will
bring -- I believe it would be two laptops.  I was just
sitting down with her going through it.  And she's got one
and another.

THE COURT:  Well and there may be -- what's it
called?  A legacy with archive documents and then one or
more current.  I don't care and I don't know, but I'm
mentioning it because it would be helpful.

All right.  So that's Plaintiff's discovery, two
depos, the two individuals, and then the 30(b)(6) for the
two companies.

And now let's talk about your views on depositions
from Defendant -- Defendants of your clients and their
materials or whatever.

MR. GENTLE:  Our position is, as I already stated,

1  that discovery closed.  I understand that we're -- we've

2  moved beyond that now.

3          THE COURT:  Right.

4          MR. GENTLE:  Are you looking for the number of

5  depositions the Federation would be comfortable with?

6          THE COURT:  Well, what have you been asked for?

7  And what have you tentatively agreed or not?

8          MR. GENTLE:  No.  We vehemently opposed reopening

9  discovery, of course with the exception of providing all of

10 the initial disclosures, which we understand are necessary

11 to proceed to trial.

12         THE COURT:  Yeah, and let me just say, so that we

13 simplify this discussion, you will have to produce witnesses

14 because the fact that you-all did not produce documents in

15 initial disclosures prior to close of discovery, means you

16 have no documents to use in any context.  Listing them would

17 not be enough in my world.

18         So in fairness, I'm directing that you continue to

19 do the production and you work out whatever sampling or

20 whatever.  I don't think you have to give all of the

21 documents.  Strike that.

22         I don't think you have to give all the questions

23 that you've ever used in any of your exams over the years.

24 I do not think you have to do that, but to the extent that

25 some representative group are going to be produced, you have

1  to disclose those questions and you have to disclose how you

2  chose those questions, and I strongly recommend that there

3  be some randomness to the selection, okay?

4           I mean, you can also disclose additional ones that

5  you know of and copy, if that's part of your strategy, but

6  I'm not going to make you disclose all of your questions.  I

7  agree with you that would not be necessary here.

8           MR. GENTLE:  Thank you, Your Honor.

9           THE COURT:  But you do have to disclose some, and

10 so you need to figure out how to do that.

11          MR. GENTLE:  Understood.

12          THE COURT:  And frankly had the disclosures been

13 made during the discovery period, I might have a little more

14 strict view of what I would allow the Defendants, who have

15 been remiss, to get, but they are entitled to some discovery

16 and this is an awkward situation here because we developed a

17 schedule fairly early on in this case.  And then with all

18 the motions and amended complaints and the corrected and,

19 you know, my rulings, we just ran out of time, and I'm not

20 throwing stones at anybody.  We just in the real world there

21 has got to be enough time.

22          So who are you planning to produce as your person

23 with knowledge?

24          MR. GENTLE:  We've presented the head of the

25 Federation, Debra Persinger (phonetic).  I can't confirm

1  that.

2          THE COURT:  You haven't yet produced her?

3          MR. GENTLE:  No.

4          THE COURT:  But you're identifying her?

5          MR. GENTLE:  That would likely be who we would

6  produce.  I would have to confer with the client to confirm

7  that.

8          THE COURT:  Okay.  Fair enough.  And is she the

9  person who's going to know about the documents, as well?

10          MR. GENTLE:  Absolutely.

11          THE COURT:  She has on the ground knowledge of

12  what's gone on?

13          MR. GENTLE:  Yes, Your Honor.

14          THE COURT:  Great.  Okay.  Anybody else?

15          MR. GENTLE:  I don't believe so, Your Honor.  I

16  think one 30(b)(6) witness will be able to answer all of the

17  questions Counsel may have.

18          THE COURT:  Okay.  And this is on your claims

19  against Defendants, right?

20          MR. GENTLE:  Understood, yes.

21          THE COURT:  Okay.  If there is -- well, you have a

22  Motion to Dismiss that I never ruled on.  I just said the

23  counterclaim -- counterclaims were untimely.

24          MR. GENTLE:  Yes.

25          THE COURT:  And have you done any analysis -- if

1  the counterclaims are permitted, have you done any analysis

2  of what witnesses would be necessary from your 30(b)(6)

3  standpoint?

4          MR. GENTLE:  To defend ourselves?

5          THE COURT:  To defend yourself?

6          MR. GENTLE:  Your Honor, we have not proceeded

7  that far in the planning or strategizing.

8          THE COURT:  Okay.  Well, this is the stage of the

9  play:  You-all should go ahead and do your discovery in

10  November based on what has already been requested and

11  discussed, and consider the admonition that I've given,

12  which is if you didn't produce it during the discovery

13  period, it cannot be used during motion period or at trial.

14          And if it's been requested, fine, in some sort of

15  discovery interrogatory or whatever, fine, but if it has not

16  and you want to use it, Rule 26 initial disclosures need to

17  be supplemented.

18          When would you both like to supplement your

19  20(b)(6)?  Rule 26 initial disclosures, when would you like

20  to make those disclosures and/or supplementation?  I gather

21  Plaintiff hasn't made the disclosures yet anyway.

22          MR. GENTLE:  We have not.  I believe that we would

23  endeavor to complete them prior to the depositions.

24          THE COURT:  How about sooner than that?

25          MR. GENTLE:  As soon as possible.

1              THE COURT:  What are you thinking?  Give me a

2     certain deadline.

3              MR. GENTLE:  Okay.  Let's say -- where are we at?

4     The 5th today?

5              THE COURT:  I mean, you're the Plaintiff in this

6     case.

7              MR. GENTLE:  I understand, Your Honor.  Could we

8     have two weeks, so November 21st?

9              THE COURT:  That's a little late.

10             How about November -- today is the 6th, so how

11    about November 15 -- no, November 16.  That's ten more days.

12             MR. GENTLE:  Okay.

13             THE COURT:  It's a Friday.

14             MR. GENTLE:  I just want to make sure that if I

15    have my dates clear here, we will still need to respond to

16    the current Motion for Leave by the 9th and then we'll have

17    our initial disclosure documents due on November 16.

18             THE COURT:  Right.  We intend to rule on the

19    motion almost immediately.

20             MR. GENTLE:  Okay.

21             THE COURT:  You know, it takes a few days, but

22    then 9th -- depending on when you file it, the 9th is a

23    Friday.  I'm going to endeavor to get some ruling out by the

24    13th.

25             MR. GENTLE:  Okay.

1          THE COURT:  Which is the next business day,

2    because I know you guys are -- I'm putting you on a time

3    limit and I feel the same way about myself.

4          So the 13th, somehow we'll get something out.

5          And the Motion to Dismiss that was filed has --

6    there's a Motion to Dismiss by Plaintiff against the

7    Defendant's claim substantively.  The Motion to Dismiss was

8    filed with the 12(f) motion for untimeliness.  And I think

9    that deadline -- or that motion was filed October 1.

10          MR. GENTLE:  It was a single filing, Your Honor.

11          THE COURT:  Right.  So it was responded to -- 76

12   -- oh, you did reply.

13          Mr. Franck, oh, you did respond on the 22nd of

14   October.  Okay.  So if I allow the filing of the

15   counterclaims, then I'm going to endeavor to rule on the

16   Motion to Dismiss, which I declared moot earlier.

17          And I'm not sure when I'll enter that ruling, but

18   if I do allow the counterclaims, there will not be discovery

19   on those until I've ruled on the Motion to Dismiss.  Okay?

20          I will get that ruling out.  It should get out by

21   the end of November for sure.

22          But if I do allow the counterclaims and they're

23   not dismissed, then there will need to be a little time for

24   discovery and I have not covered that discovery schedule

25   yet.  I'm anticipating that will be in December.  I think

1  there's a lot of overlap in terms of knowledge, but I'll

2  warn the Plaintiff that if I allow the counterclaims,

3  Plaintiff will have to -- both sides then will have to make

4  initial disclosures within one week on any claims that are

5  allowed.

6          And then you'll have a month from then to do

7  discovery.  This again I'm keeping a very tight leash on

8  this.  I think this thing should have been -- or could have

9  been raised earlier in other settings and I'm trying to keep

10  the case moving along.

11          I have a Docket Control Order.  Let's see what it

12  says.

13      (Pause in the proceedings.)

14          THE COURT:  You all have extended deadlines.  ADR

15  was going to be by December 1.

16          Let me say this to you-all about ADR.  I'm going

17  to recommend that you do ADR, aim for the first week of

18  December, because by then you will have finished your depos,

19  you will know whether counterclaims are allowed, and you

20  will -- you will either have made or be about to make the

21  initial disclosures on your claims, documents in support of

22  your claims and defenses.

23          So I'm basically suggesting to you that you aim

24  for your deposition -- your mediation be the week of

25  December 10th.

1      MR. GENTLE:  Yes.  I think that's a very good

2  idea.

3      MR. GENTLE:  The mediator that we had considered

4  is available during that period.

5      THE COURT:  Is or is not?

6      MR. GENTLE:  Is.  So --

7      THE COURT:  Is?

8      MR. GENTLE:  Yes.

9      THE COURT:  Will that work for you?

10      MR. GENTLE:  Yes.  Again because the

11  representative of the Plaintiff needs to be there.

12      THE COURT:  Right.

13      MR. GENTLE:  I need to meet with the client and

14  make sure they're available.

15      THE COURT:  Sure.

16      MR. GENTLE:  And I'm sure Defendants will have to

17  do the same.

18      THE COURT:  Of course, both of you do.

19      Okay.  Have you agreed on this mediator?

20      MR. FRANCK:  Your Honor, I have not.  We've looked

21  at it Friday which was they're going to have one.  We're

22  going to talk about it right now, so.

23      THE COURT:  Okay.  Who are you thinking of?

24      MR. GENTLE:  Michael Schneider.

25      THE COURT:  Okay.  Michael Schneider, if I'm --

1  this is the former federal district judge?

2          MR. GENTLE:  Yes, it is.

3          THE COURT:  Michael Schneider is a very

4  experienced straight-up guy, who was a state district judge,

5  I believe, then I think was a state court of appeals judge,

6  and then became a federal district judge in the Eastern

7  District.  He was in Houston, though, for his state judge

8  career.  Then he went to take a federal bench and would get

9  the bench that he was offered, he moved to -- I don't know

10 some city in East Texas.  And he is -- I don't even know

11 what party he was when he ran.  I assume he was Republican,

12 but I'm not sure.

13         But the upshot is he was a very -- he's a straight

14 shooter.

15         So I think -- and he's smart.  So --

16         MR. FRANCK:  Sounds good to me.

17         THE COURT:  -- honestly I think he's -- and he's

18 experienced and he knows something about all of the claims

19 that parties have discussed today.  He would know something

20 about most of them, if not all.  So based on his federal

21 court experience.  So and a state court for negligence.

22         MR. FRANCK:  And he's available.

23         THE COURT:  And apparently is available.

24         MR. FRANCK:  That's good.

25         THE COURT:  He's a very nice guy from what I

1  understand.

2          MR. FRANCK:  Your Honor, obviously --

3          THE COURT:  He's not a close friend of mine.  I

4  don't socialize with him, but I'm just talking about his

5  reputation.

6          MR. FRANCK:  But I'd like to just say yes to that.

7          MR. GENTLE:  Thank you.

8          THE COURT:  All right.  So let's get the mediation

9  on the books, no matter what happens on all these other

10  preliminary rulings, and you'll get your discovery done and

11  I'm very keen on you guys being comprehensive in making the

12  disclosures.

13          The case simply isn't that complicated, and so

14  these deadlines are tight, but they're certainly doable.

15          So I've resolved, I think, the discovery issues to

16  the extent I can.  If I allow the counterclaims, then there

17  will have to be some agreement among the parties on that.

18          I think that's about all we can do today.

19          MR. FRANCK:  Your Honor, yes.  I would question

20  about our proposed discovery.  I have it ready to be sent

21  out in the morning, the PMK deposition notice, plus the

22  request for documents.  And so my question is:  Do you want

23  -- my idea was to let them finish their depositions --

24          THE COURT:  No.  You get yours out.

25          MR. FRANCK:  Okay.  All right.

1          THE COURT:  You have to get it out.  This should

2    have been done before, but I understand because of the

3    Motions to Dismiss and whatnot, it wasn't done.  But the

4    defense has known what these claims are from day one.  I

5    mean, there's an Amended Complaint, I grant you, but it was

6    not -- it's been since July and we're now in November, so I

7    think, you know, the Amended Complaint was in May, then

8    there was the corrected in July.

9          Honestly this is a gift.

10         MR. FRANCK:  I agree.

11         THE COURT:  So get the discovery out, please.

12         MR. FRANCK:  I will get it out.  What I'm worried

13   about is getting it -- I can get it to them right away.

14         THE COURT:  Oh.

15         MR. FRANCK:  But they would have response time and

16   everything.

17         THE COURT:  Yes.  It's true, that's true.

18         You said you have it with you?

19         MR. FRANCK:  Yes.  They have it.  I've already

20   sent it to them.

21         THE COURT:  Oh.

22         MR. FRANCK:  They have it.

23         THE COURT:  Okay.

24         MR. FRANCK:  I gave it to them in a "Here's what I

25   want to do format."

1          THE COURT:  Oh, okay.  Well so, when did you do

2   that?  Last week?

3          MR. GENTLE:  Friday.

4          MR. FRANCK:  Friday was it?  No.  I think it was

5   earlier.  You guys have had it a few days, I hope, but

6   recently, I'd say, last week.

7          THE COURT:  Okay.  So last week was November -- I

8   don't -- I'm going to say it was the -- was it on Halloween,

9   or the day after?

10          MR. GENTLE:  We were not served with discovery,

11   Your Honor.  It was merely correspondence related to the

12   meet and confer.  He had attached discovery for us to

13   consider.  We didn't get to that point if discovery reopens,

14   so we have not necessarily, so.

15          THE COURT:  I understand.  Okay.  I get it, I get

16   it.

17          MR. GENTLE:  On another point on the discovery, I

18   assume that it -- what Counsel plans to serve us with today

19   to the extent it includes request-related counterclaims --

20          THE COURT:  You'll object.

21          MR. GENTLE:  We'll object, okay.  Fair enough.

22   Thank you, Your Honor.

23          THE COURT:  But you will have to answer on

24   anything that's even, you know, reasonably within the scope

25   of the claims and defense.

1          Now the defenses are, I will clarify.  To the
2   extent that they are antitrust claims, negligence claims, or
3   due process, constitutional, civil rights, however they're
4   characterized, claims, you do not have to answer.  Those are
5   claims.  They are not defenses to your causes of action as I
6   understand it.

7          But if they are real affirmative defenses, then
8   they're fair game.

9          MR. GENTLE:  Understood.

10         THE COURT:  And if the draft that you received
11  last week looks like and is the same as what is being handed
12  to you today, then you have until November 21 to respond.
13  That's three weeks -- that's not three weeks.  I lied.
14  Well, it would be essentially three weeks from when you got
15  the draft.  It's expedited, but that's the price everybody
16  is paying for this late discovery after the end of the
17  discovery period and the fact that the case has been pending
18  so long, and I'm trying to keep the fees down and get you
19  focused.

20         So it's a little shy of what you'd get under the
21  rules.  Everybody is suffering under that right now, okay?

22         MR. GENTLE:  Your Honor --

23         THE COURT:  I'm just having trouble believing it
24  would be particularly difficult and I don't want you to be
25  making production after the depos.  That's part of the

1  thinking.

2         Now if you guys want to extend a day or two over

3  into Thanksgiving, which is the 22nd, that's still okay, but

4  the depos are supposed to start the 26th or 7th and I feel

5  like fairness dictates that the documents be turned over.

6         I'm having trouble believing that the genuinely

7  discoverable documents are going to be materially different

8  from what you are making production of in your initial

9  disclosures.

10        MR. GENTLE:  I believe you're correct, Your Honor.

11        THE COURT:  And so that's part of the thinking on

12 why three weeks should be plenty.

13        MR. GENTLE:  Understood.

14        THE COURT:  The initial disclosures do need to be

15 turned over, though, before then.

16        MR. GENTLE:  By the 16th, I believe.

17        THE COURT:  Exactly and I would suggest strongly

18 that to the extent possible you Bates number and then you

19 can simply refer back to document numbers, rather than

20 reproducing for the document requests.  You can say,

21 "Already done.  Documents number A, B, C."

22        Or you can do them again.  I don't care.  You

23 know, that might be easier.

24        MR. GENTLE:  I think the former was a good

25 strategy.

1          THE COURT:  But I'm not trying -- but that would

2    be acceptable is what I'm saying.

3          MR. GENTLE:  Thank you.

4          THE COURT:  And that's true for you, too.

5          MR. FRANCK:  Oh, I understand once.  Let me assure

6    you.

7          Your Honor, I have one question, though.  As far

8    as the date of our PMK deposition of their folks, --

9          THE COURT:  Yes.  We need some dates.  There's

10   only one person, sounds like.

11         MR. FRANCK:  Well, it sounds like it's going to be

12   one person, which is fine.  I was going to certainly let

13   them finish my client's depo first.

14         THE COURT:  Yes, okay.

15         MR. FRANCK:  So we'll get that done, which might

16   put us into that first week of December.

17         THE COURT:  Barely.  Let's try to do it early.

18         MR. FRANCK:  Okay.

19         THE COURT:  I know that's one of the reasons I put

20   the mediation the week of December 10th.

21         MR. FRANCK:  Okay.

22         THE COURT:  There's a free week in there.

23         MR. FRANCK:  I'm not sure if they're going to want

24   that depo in Kansas or Houston or what, so let's work that

25   out.

1          THE COURT:  Yeah.  What's your preference?  Do you
2    know?

3          MR. GENTLE:  I do not, Your Honor.  I'll confer
4    with my clients.  I'm just checking right now on our
5    dispositive motions.

6          THE COURT:  I'll tell you this:  I would -- unless
7    you're going to have a problem with documents along the
8    lines I mentioned with respect to the Defendants, I would
9    recommend that it be done here because it's a lot cheaper
10   and easier for you guys to host her, than for you-all to go
11   to Kansas, but that's not a requirement.

12         MR. FRANCK:  Okay.

13         THE COURT:  Just that, again, I just think that's
14   more efficient.  That's just my editorial comment.

15         MR. FRANCK:  That's fine.

16         THE COURT:  But I would love for you-all to get
17   dates worked out within the next day or two, as soon as you
18   can reach your client, okay?

19         MR. FRANCK:  Very well.  Thank you.

20         MR. GENTLE:  Thank you, Your Honor.

21         THE COURT:  All right.  I think we've covered most
22   everything.  The Record is available on audio disc or
23   whatever they call it, CD, for $35 and my minutes will
24   simply say:  Discovery rulings made.  I don't through all of
25   this and try to reconstruct.  The Record is what's on the

1   Record and the transcript, okay?

2          Otherwise, it would be too confusing.

3          MR. FRANCK:  I would like to spend $35 to get one

4   of these.

5          THE COURT:  Okay.  Well, talk to Desiree.  She is

6   downstairs.  She'll tell you how to do that.

7          MR. FRANCK:  Very well.

8          MR. GENTLE:  Thank you, Your Honor.

9          THE COURT:  Okay.  Thank you all very much.

10         You're excused.

11      (Proceedings adjourned at 2:35 p.m.)

12                          * * * * *

13         *I certify that the foregoing is a correct*

14  *transcript to the best of my ability produced from the*

15  *electronic sound recording of the proceedings in the above-*

16  *entitled matter.*

17  */S/ MARY D. HENRY*

18  *CERTIFIED BY THE AMERICAN ASSOCIATION OF*

19  *ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

20  *JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

21  *JTT TRANSCRIPT #59513*

22  *DATE:  NOVEMBER 7, 2018*

23

24

25